**KNEUPPER & COVEY PC**
Kevin Kneupper (CA SBN: 325413)
kevin@kneuppercovey.com
A. Lorraine Weekes (CA SBN: 332369)
lorraine@kneuppercovey.com
Cyclone Covey (CA SBN: 335957)
17011 Beach Blvd., Ste. 900
Huntington Beach, CA 92647
Tel: 657-845-3100
Fax: 855-596-3707

*Attorneys for Plaintiff Josh Seaman and the putative class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION

| | |
|---|---|
| JOSH SEAMAN,<br><br>                     Plaintiff,<br><br>v.<br><br>GKN AEROSPACE TRANSPARENCY SYSTEMS INC., GKN AEROSPACE SERVICES LTD, and MELROSE INDUSTRIES PLC,<br><br><br>                     Defendants. | Case No.: 8:26-cv-1374<br><br>**COMPLAINT FOR:**<br>  (1) Negligence;<br>  (2) Private nuisance;<br>  (3) Public nuisance;<br>  (4) Strict liability – abnormally dangerous activity; and<br>  (5) Trespass to land.<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff, Josh Seaman, individually and on behalf of all others similarly situated, brings this proposed class action complaint against defendants GKN Aerospace Transparency Systems Inc., GKN Aerospace Services Ltd, and Melrose Industries PLC (collectively, "Defendants") and alleges as follows:

1.     Garden Grove is a diverse residential city in Orange County. It is mostly middle

class. In the city's northwest corner, on the border with nearby Stanton, amidst coffee shops, a mobile home community, single-family houses and a sports park with tennis courts and a roller rink, Defendants operate an industrial manufacturing facility. At their manufacturing facility, Defendants use toxic chemicals to make airplane parts. One of the toxic chemicals Defendants use is methyl methacrylate, a clear liquid that is highly hazardous, volatile, and flammable.

2.      Defendants' Garden Grove facility ("the GKN Facility") is located at 12122 Western Ave., Garden Grove, California. Defendants store thousands of gallons of methyl methacrylate at their GKN Facility.

3.      On the afternoon of May 21, 2026, a 34,000-gallon tank of methyl methacrylate at the GKN Facility overheated. The prognosis was dire: officials warned that the methyl methacrylate tank would either rupture and leak its approximately 7,000 gallons of highly-hazardous chemicals or, worse, effectively turn into a bomb and explode.

4.      Multiple waves of evacuation orders were issued and ultimately over 40,000 homeowners, businesspeople and residents from areas surrounding the GKN Facility were forced to flee their homes and businesses. Defendants' overheating, unstable, potentially-explosive hazardous-chemical storage tank made it too dangerous to stay.

5.      Plaintiff was among those whose lives were upended by these evacuations and the related chemical exposure, interference with property rights, economic damages, inconvenience, and annoyance.

6.      Plaintiff brings this action, individually and on behalf of all others similarly situated, to hold Defendants accountable for the damages he and others suffered because of the catastrophic chemical crisis wrought by Defendants' negligence and profits-over-safety approach to storing thousands of gallons of a hazardous chemical in a residential city.

**PARTIES**

7.      Plaintiff Josh Seaman is a resident of Orange County, California. As a direct result of the incident described herein, Plaintiff Seaman was forced to evacuate to a hotel along with his dog and partner and suffered housing instability, loss of personal property

access, and related economic and non-economic harm.

8. Defendant Melrose Industries PLC ("Melrose") is a United Kingdom public company. In 2018, Melrose acquired Defendant GKN Aerospace Services Ltd along with its wholly owned subsidiary Defendant GKN Aerospace Transparency Systems Inc. in a hostile takeover.

9. Melrose's business model involves buying distressed and underperforming companies, juicing their short-term profits and then dumping them for a quick buck. In its own words:

> Melrose operates a "Buy, Improve, Sell" model, in which we raise money from our investors to acquire underperforming manufacturing businesses, invest heavily to achieve operational improvements, before selling them to a new home for the next stage of their development. Following this, we return the net proceeds to shareholders.[1]

Defendant Melrose—which had operating profit of $647 million in 2025—exercises ownership, control, and strategic oversight over GKN Aerospace operations, including policies governing safety, industrial operations, and risk management at the GKN Facility. Its registered address is 11th Floor, The Colmore Building, Colmore Circus Queensway, Birmingham, United Kingdom, B4 6AT.

10. Defendant GKN Aerospace Services Ltd. is a United Kingdom entity involved in oversight, operational coordination, and management functions relating to GKN Aerospace operations, including those conducted at the GKN Facility. Before Melrose's 2018 hostile takeover of GKN, GKN's chairman appealed to shareholders to oppose the takeover claiming that Melrose was "more focused on financial engineering than real engineering."[2]

---

[1]      *See Return of Capital Guidance Note*, MELROSE INDUSTRIES PLC, *available at*: https://www.melroseplc.net/media/laxhzwpl/return-of-capital-guidance-note.pdf (last accessed May 26, 2026) [https://perma.cc/JRU5-LXY2].

[2]      Karl West, *GKN faces renewed fight with 'asset stripper' Melrose*, THE GUARDIAN (Feb. 26, 2028), *available at* https://www.theguardian.com/business/2018/feb/26/gkn-melrose-jeremy-corbyn (last accessed May 27, 2026) [https://perma.cc/WH2K-5SJR].

11. The principal place of business of GKN Aerospace Services Ltd. is 1301 Solana Blvd., Suite 1528, Westlake, TX 76262.

12. Defendant GKN Aerospace Transparency Systems Inc. is a California corporation that operates the GKN Facility located at 12122 Western Avenue, Garden Grove, California. Its principal place of business is 12122 Western Avenue, Garden Grove, CA 92841. On information and belief, GKN Aerospace Transparency Systems Inc. is a wholly owned subsidiary of GKN Aerospace Services Ltd. (Collectively Defendants GKN Aerospace Transparency Systems Inc. and GKN Aerospace Services Ltd. are referred to as the "GKN Aerospace Defendants").

13. On information and belief, at all relevant times, Defendants acted as a unified enterprise with respect to the ownership, operation, control, maintenance, and supervision of hazardous chemical systems at the GKN Facility, including systems involving storage and handling of methyl methacrylate.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d): the proposed class consists of more than 100 members, minimal diversity exists between at least one class member and one defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

15. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in California and maintain and operate facilities within this state. Defendant GKN Aerospace Transparency Systems Inc. and Defendant GKN Aerospace Services Ltd. are also both registered to do business in California.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and injuries giving rise to the claims occurred in this District, including operation of the GKN Facility and the resulting evacuations.

## COMMON FACTUAL ALLEGATIONS

17. Defendants own, control, and operate the GKN Facility, where they produce windshields and windows for airplanes.

18.    Methyl methacrylate is a key component of the plexiglass Defendants use to make airplane windows and windshields.

19.    Methyl methacrylate is a volatile, toxic, and flammable industrial chemical that can cause significant harm to human and animal health and the environment.

20.    According to the Environmental Protection Agency, methyl methacrylate can irritate the skin, eyes, and mucous membranes in humans and can cause chest tightness, dyspnea, coughing and wheezing as well as neurological symptoms such as headache, lethargy, light-headedness, and a sense of heaviness in arms and legs.

21.    Safe handling of methyl methacrylate requires engineered temperature and pressure controls, continuous monitoring systems, ventilation safeguards, emergency shutdown mechanisms, and regular inspection and maintenance of storage infrastructure and safety systems.

22.    Failure to properly design, maintain, inspect, or operate such systems creates foreseeable risks of overheating, vapor emission, thermal runaway, and catastrophic tank failure.

### Defendants' 7000 Gallons of Methyl Methacrylate Become Unstable

23.    On or around May 21, 2026, a chemical storage tank at the GKN Facility containing about 7,000 gallons of methyl methacrylate began overheating. The storage tank was abnormally hot, and its internal pressure was unstable.

24.    The Orange County Fire Authority ("OCFA") and other emergency responders were dispatched to the GKN Facility in response to reports of a chemical emergency. OCFA personnel initiated emergency response measures, including monitoring, cooling, and containment efforts, to stabilize the condition of Defendants' methyl methacrylate tank and prevent escalation of the crisis.

25.    Emergency officials assessed the situation as presenting a significant hazardous risk requiring immediate intervention because of the potential for fire, explosion, or further chemical release.

26.    At a May 22, 2026 press conference OCFA Division Chief Craig Covey

explained: "There are literally two options left remaining: One, the tank fails and spills a total of about [6,000] to 7,000 gallons of very bad chemicals into the parking lot and that area. Or two, the tank goes into a thermal runaway and blows up, affecting the tanks that are around it that have fuel or chemicals in them as well."

27. Local emergency management agencies coordinated with OCFA in establishing safety perimeters around the GKN Facility and issuing public safety warnings to surrounding residential communities.

***The Risk Posed by Defendants' Volatile Methyl Methacrylate Tank Forces Thousands to Evacuate***

28. In response to the evolving hazardous materials condition at the GKN Facility, governmental authorities, including OCFA and local emergency management agencies, issued emergency directives including mandatory evacuation affecting large portions of Garden Grove and surrounding residential communities.

29. These orders required the immediate displacement of tens of thousands of residents, resulting in interruption of normal residential life, evacuation from homes, and relocation to temporary accommodations while emergency conditions remained under assessment.

30. The evacuation zone established on or around May 22, 2026 (the "Evacuation Zone") included the area south of Ball Road, east of Valley View Street, west of Dale Street, and north of Trask Avenue.

31. OCFA hazardous materials personnel and other emergency responders established exclusion zones and restricted access to residential areas in the vicinity of the GKN Facility while implementing monitoring, cooling, and containment measures directed at preventing escalation of the chemical condition.

32. The State of California issued an emergency declaration in response to the incident, authorizing the deployment of state-level resources to support local emergency response operations, including evacuation coordination, hazardous materials containment assistance, and public safety management.

*Residents, Property Owners, and Businesspeople in the Exclusion Zone Suffer Harm Because of Defendants' Noxious and Unstable Methyl Methacrylate Tank*

33.   The failure of Defendants' 34,000-gallon tank to properly contain Defendants' toxic methyl methacrylate substantially disturbed residential life and commercial activity in the area surrounding the GKN Facility. Victims like Plaintiff and the members of the class suffered a range of injuries including forced displacement and the loss of the use and enjoyment of their homes.

34.   Residents of the area impacted by Defendants' chemical crisis also incurred significant out-of-pocket expenses, including for temporary housing, transportation, food, and related emergency expenditures.

35.   Properties within the affected area were exposed to chemical odors and airborne contaminants, raising concerns regarding indoor air quality, surface contamination, and residual chemical presence. Properties so exposed will need to be remediated and personal property impacted by methyl methacrylate exposure will need to be cleaned or replaced.

36.   The incident caused ongoing uncertainty regarding the safety and habitability of affected residences.

*Plaintiff, Like the Rest of the Class, Had His Life Upended by the Chemical Crisis Defendants Created*

37.   Plaintiff Josh Seaman lives in a townhome within the Evacuation Zone.

38.   On the morning of May 22, 2026, Mr. Seaman, who works as a production assistant, got up and went to work. As he was preoccupied with a television shoot, his partner was directed to evacuate the townhome she shared with Mr. Seaman. This evacuation order was directly related to the chemical crisis at the GKN Facility.

7
COMPLAINT

39.     Mr. Seaman's partner was unable to reach Mr. Seaman, who was in the middle of shooting a television show, but she was able to pack up some of their belongings and flee.

40.     When Mr. Seaman's shoot broke for lunch, he was able to speak with his partner and they decided that they would get a hotel room until it was safe for them to return home.

41.     Mr. Seaman and his partner were able to find a hotel room for themselves and their elderly dog, Otto. Mr. Seaman's partner covered the hotel costs with the understanding and agreement that Mr. Seaman would reimburse her for half of them, which he has done.

42.     The hotel where Mr. Seaman and his partner stayed on the nights of May 22 and May 23, 2026, did not have a kitchenette and the couple was forced to buy prepared food from nearby restaurants. This became financially unsustainable for them and on May 24, 2026, they decided to relocate to a hotel that included some in-room food storage and preparation facilities.

43.     Mr. Seaman and his partner stayed at the second hotel between May 24, 2026, and May 27, 2026. Mr. Seaman's partner covered the hotel costs with the understanding and agreement that Mr. Seaman would reimburse her for half of them, which he has done.

44.     Mr. Seaman had hoped to spend Memorial Day Weekend relaxing at home, enjoying a family barbeque, and preparing for interviews he'd conduct as part of his side-job as a freelance journalist. Instead, he was thrust into a chaotic hotel environment, surrounded by other displaced persons, unable to attend a family celebration (he did not want to leave Otto alone in the hotel room), and hindered in his ability to get any work done.

45.     Mr. Seaman suffered out-of-pocket expenses including hotel and food costs as a direct result of the evacuation order and also experienced significant distress, annoyance, inconvenience, aggravation and lost time as a result of Defendants' conduct and the chemical crisis that conduct caused.

### Defendants' Conduct Was Malicious and Oppressive

46.     On information and belief, Defendant Melrose's approach to overseeing and controlling the operations of the GKN Aerospace Defendants was primarily profit-driven

and Melrose ruthlessly prioritized increasing profits even if that came at the expense of enhanced safety and precautionary measures.

47. Defendants' conduct was malicious. In particular, Defendants' decision to store thousands of gallons of highly toxic, dangerous, and flammable methyl methacrylate in the midst of a densely-populated residential community and to do so without taking all necessary safety and precautionary measures was despicable conduct. Defendants' despicable conduct reflects their willful and conscious disregard of the rights or safety of those, like Plaintiff and the class who live, work, sleep, play sports, and shop in the vicinity of the industrial manufacturing facility where the GKN Aerospace Transparency Systems, Inc. uses toxic and dangerous chemicals to generate profits for Melrose and its shareholders.

48. Defendants' conduct was also oppressive. This is because Defendants' despicable conduct subjected Plaintiff and the class to unjust hardship in conscious disregard of their rights.

49. Plaintiff and the Class are entitled to punitive damages.

### *Class Allegations*

50. Pursuant to Federal Rule of Civil Procedure 23, the named Plaintiff Josh Seaman, seeks class certification. Plaintiff proposes the following class definition:

> **Class:** All natural persons who as of May 22, 2026, resided in real property within the Evacuation Zone, excluding those who have brought individual actions relating to personal or bodily injury.

51. Excluded from the class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff as well as Plaintiff's counsel and employees and staff affiliated with Plaintiff's counsel.

52. Plaintiff reserves the right to amend or modify the class description by altering it or by making it more specific or by dividing the class members into subclasses or limiting

the issues as appropriate.

53. **Numerosity:** Plaintiff and the class are informed and believe, and on that basis allege, that the class exceeds 40,000 people and, as such, is so numerous that individual joinder of all members would be impracticable.

54. **Commonality:** Defendants' practices and omissions were, on information and belief, applied uniformly to all members of the class such that the questions of law and fact are common to all members of the class. All members of the putative class were and are similarly affected by having resided, owned property, or worked in the Evacuation Zone necessitated by Defendants' wrongful conduct and the relief sought herein is for the benefit of Plaintiff and all members of the putative class.

55. Questions of law and fact common to the class exist that predominate over questions affecting only individual members. The common questions of law and fact include:

a. Whether Defendants exercised reasonable care in their storage of methyl methacrylate;

b. Whether any breach of Defendants' duty of reasonable care in storing methyl methacrylate was the proximate cause of the damages suffered by Plaintiff and the class;

c. Whether Defendants' use of methyl methacrylate in the manufacturing of airplane components was an abnormally dangerous or ultrahazardous activity such that Defendants are strictly liable for the damages suffered by Plaintiff and the class;

d. Whether Defendants are liable to Plaintiff and the class for punitive damages;

e. Whether Defendants, through their acts or omissions, created a condition or permitted a condition to exist that was harmful to health or was a fire hazard;

f.  Whether Plaintiff and the class consented to the nuisance condition created by Defendants' conduct;

56.  **Typicality**: The claims asserted by Plaintiff in this action are typical of the claims of the members of the class as the claims arise from the same course of conduct by Defendants, all members of the class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

57.  **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the members of the class. Plaintiff has no interest adverse to the interests of the other class members. Plaintiff has retained competent counsel with substantial experience in complex litigation and class actions and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the class.

58.  **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, far outweigh any difficulties that it might be argued could arise in connection with the management of this class action. These benefits make class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that many members of the class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

59.  **Predominance**: Certification of this class action is appropriate because the questions of law or fact common to the respective members of the class predominate over questions of law or fact affecting only individual members. Certification is also appropriate because, Defendants acted, or refused to act, on grounds generally applicable to the class,

thereby making appropriate the relief sought on behalf of the class as a whole. Further, given the large number of potentially injured class members, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiff's claims for class-wide treatment is also appropriate because Plaintiff and the class can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

60. Notice to the members of the class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all class members. This is true because the class is defined in terms of the Evacuation Zone, a tightly circumscribed geographic area. Plaintiff anticipates that notice to the class could be efficiently accomplished through a postcard campaign directed toward residential addresses within the Evacuation Zone.

## FIRST CAUSE OF ACTION – NEGLIGENCE

61. Defendants owed Plaintiff and members of the proposed class a duty to exercise reasonable care in the ownership, operation, inspection, maintenance, storage, handling, and monitoring of hazardous chemical systems at the GKN Facility, including systems involving methyl methacrylate, a volatile industrial chemical capable of producing toxic vapor release, thermal instability, fire, explosion, and off-site migration.

62. Defendants breached their duty of care by failing to exercise reasonable care in the operation and maintenance of the GKN Facility's hazardous chemical systems, including permitting unsafe storage and operational conditions to exist, failing to adequately monitor and maintain critical safety controls, failing to implement adequate containment safeguards, and failing to take reasonable steps to prevent foreseeable chemical instability, vapor release, or off-site migration.

63. Plaintiff and all class members suffered harm in connection with the chemical crisis caused by Defendants' negligence. The harm suffered by Plaintiff and the class includes evacuation, displacement, loss of use and enjoyment of property, lost wages, and

property-related economic loss, which are the types of harm inflicted on surrounding communities by companies that engage in the unsafe handling of hazardous industrial chemicals.

64. Defendants' negligence was a substantial factor in causing the harm suffered by Plaintiff and the class.

## SECOND CAUSE OF ACTION – PRIVATE NUISANCE

65. Plaintiff Josh Seaman occupied and/or controlled property located within the Evacuation Zone.

66. Defendants, by acting and failing to act in connection with the ownership, operation, maintenance, supervision, and control of an industrial facility engaging in hazardous chemical activity, created, maintained, and failed to immediately abate a condition at the GKN Facility that constituted a nuisance in that it was harmful to health, constituted a fire hazard and risk of explosion, and was an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life and property.

67. The condition included the release, emission, migration, and/or threatened release of methyl methacrylate vapors and other hazardous chemical substances emanating from the GKN Facility, which foreseeably impacted surrounding residential communities, including Plaintiff Josh Seaman's residence.

68. The condition was created or permitted to exist because of Defendants' intentional and unreasonable conduct and/or negligent and reckless conduct in the operation of hazardous chemical systems, including industrial storage of volatile substances under conditions that created a foreseeable risk of overheating, vapor release, and catastrophic failure, and/or arose from an abnormally dangerous activity.

69. Alternatively, the condition was created or permitted to exist because of Defendants' abnormally dangerous activities.

70. The interference with Plaintiff's use and enjoyment of their property was substantial and not trivial or speculative, and included emergency evacuation orders, forced displacement, inability to safely occupy his property for its intended residential purpose,

and disruption of ordinary use including shelter, sleep, and daily residential living activities.

71. The interference was unreasonable when balanced against any utility of Defendants' conduct, especially considering the severity of the risk posed to surrounding residential communities, including credible risk of fire, explosion, and toxic exposure, and the fact that, on information and belief, better containment, monitoring, and safety measures could have prevented or substantially reduced the potential harm.

72. Plaintiff and class members did not consent to the condition or to the interference with their property rights.

73. Plaintiff and class members were harmed because of the nuisance condition, and suffered damages including loss of use and enjoyment of property, evacuation and relocation expenses, and disruption of residential occupancy.

74. Defendants' conduct was a substantial factor in causing Plaintiff's and class members' harm.

### THIRD CAUSE OF ACTION – PUBLIC NUISANCE

75. Defendants, by acting and/or failing to act in connection with the ownership, operation, maintenance, supervision, and control of an industrial facility engaging in hazardous chemical activity, created or permitted to exist a condition that was harmful to health, was a fire hazard and risk of explosion, was indecent or offensive to the senses, and was an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life and property.

76. The condition—the hazardous chemical conditions emanating from the GKN Facility and associated risk of a toxic leak or explosion—affected a substantial number of people at the same time, Plaintiff and the class among them.

77. An ordinary person would be reasonably annoyed or disturbed by the existence of a hazardous industrial condition involving overheating chemical storage, emission of toxic vapors, and credible risk of fire, explosion, or widespread chemical release.

78. The seriousness of the harm caused by the condition Defendants created outweighs any social utility of Defendants' conduct, particularly in light of the foreseeable

risk to densely populated residential communities and the availability of reasonable safety, containment, and monitoring measures that, on information and belief, could have prevented or mitigated the condition.

79.    Neither Plaintiff nor the class consented to Defendants' conduct or to the creation or maintenance of the hazardous condition.

80.    Plaintiff and the class suffered harm that was different in kind from the type of harm suffered by the general public, including specific evacuation costs, displacement from their residences, interference with their private residential property rights, lost wages and lost profits, and property-related economic losses.

81.    Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiff and the class.

## FOURTH CAUSE OF ACTION – STRICT LIABILITY (ABNORMALLY DANGEROUS ACTIVITY)

82.    Defendants were engaged in an abnormally dangerous activity involving the storage, handling, and use of large quantities of methyl methacrylate and related volatile industrial chemicals at the GKN Facility. This abnormally dangerous activity occurred near residential communities.

83.    Defendants are strictly liable for the harm caused by such activity regardless of the degree of care exercised.

84.    The activity involves a high degree of risk of serious harm to persons and property, including toxic vapor release, fire, explosion, respiratory injury, and contamination of surrounding residential environments, particularly where large volumes of methyl methacrylate are stored and maintained in industrial conditions adjacent to populated areas.

85.    The risks associated with large-scale industrial storage of methyl methacrylate in close proximity to densely populated residential areas cannot be fully eliminated by the exercise of reasonable care, given the inherent volatility and thermal instability of the chemical at industrial volumes.

86.     The activity is not a matter of common usage in residential communities and instead constitutes a specialized industrial operation requiring heightened regulatory oversight, safety engineering controls, and hazardous materials containment procedures.

87.     Plaintiff and the class suffered harm as a result of Defendants' abnormally dangerous activity, including evacuation, exposure risk, displacement, lost wages, lost profits, and interference with residential property use and enjoyment.

88.     The harm suffered by Plaintiff and the class is the kind of harm that would be anticipated as a result of the risk created by Defendants' storage, handling, and use of large quantities of methyl methacrylate.

89.     Defendants' abnormally dangerous activity was a substantial factor in causing the harm suffered by Plaintiff and the class.

90.     Defendants are strictly liable for all harm proximately caused by the abnormally dangerous activity at the GKN Facility.

### FIFTH CAUSE OF ACTION – TRESPASS TO LAND

91.     Plaintiff Josh Seaman leased, occupied, and/or controlled residential property located within the Evacuation Zone.

92.     On information and belief, Defendants unintentionally but recklessly or negligently caused or permitted the physical invasion of Plaintiff's and class members' real property interests through the migration, deposition, and infiltration of hazardous chemical vapors, airborne particulates, and/or toxic residues emanating from the GKN Facility.

93.     The invasions occurred without Plaintiff's consent, or exceeded any consent that may have been given, and resulted in interference with possessory rights in the property.

94.     On information and belief, the invasions caused actual harm, including interference with habitability, use and enjoyment of the property, and exposure risk.

95.     Defendants' conduct was a substantial factor in causing Plaintiff's and the class's harm.

### PRAYER FOR RELIEF

Plaintiff respectfully requests, on behalf of himself and all others similarly situated,

the following relief:

A.     An order certifying the class and resident, property owner, and business subclasses, appointing Kneupper & Covey PC as class counsel, and appointing Josh Seaman, as class representative.

B.     Actual damages, including consequential damages, against Defendants in an amount to be proven at trial;

C.     Nominal damages;

D.     Punitive damages;

E.     Reasonable costs;

F.     Attorney fees as provided for by law, equity, or contract, and including a contingency-fee multiplier to account for the contingency-fee nature of this representation;

G.     Prejudgment and post-judgment interest; and

H.     Such other relief as the court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial of the facts alleged above on all counts and issues so triable.

DATED: May 28, 2026                              Respectfully submitted,

_____

A. Lorraine Weekes

KNEUPPER & COVEY PC
17011 Beach Blvd Ste 900
Huntington Beach, CA 92647
657-845-3100

*Attorneys for Plaintiff and the putative class*